Gray *v.* State.

No. 39600    March 21, 1955    78 So. 2d 588

*Russell Wright,* Meridian, for appellant.

*Joe T. Patterson,* Asst. Atty. Gen., Jackson, for appellee.

McGehee, C. J.

The appellant, Monroe Gray, was indicted at the February 1954 term of the Circuit Court of Lauderdale County for the crime of assault and battery with intent to kill and murder one Richard Dunn. He was tried and convicted of this alleged crime at the August 1954 term of said court, and was sentenced to serve a term of five years in the state penitentiary.

The defendant shot Mr. Dunn, a customer in his cafe, near closing time at midnight on November 16, 1953. He fired one shot with his fully loaded pistol and the bullet struck Mr. Dunn in the front of his neck and came out in the back thereof. The defendant had never seen the victim of the shooting prior to the night it occurred. In other words, they were total strangers, but

on the occasion of the shooting Mr. Dunn bought a bottle of beer from the defendant, and testified at the trial that about two minutes thereafter the latter told him: "You better get out of here"; that he then asked "Why? I haven't done anything"; that the defendant then said, "Well, you better get out of here"; that the witness thereupon stated, "No, I am going to finish my beer and then I will leave"; that the defendant then said, "You had better get out of here now"; that the witness then said, "No, I have paid for a bottle of beer and I want to drink it"; that the defendant then walked over behind the counter, and when he came back he again said, "You had better get out of here"; and that when the witness raised up his head, the defendant shot him.

In other words, according to the version of this prosecuting witness, the defendant shot him without the slightest provocation, even though the witness was a customer in the place of business and had not done anything to provoke a difficulty.

Some officers testified on behalf of the State and related to the jury what the defendant told them when they arrived at the scene, after he had notified the police as to what occurred. The officers said in substance that the defendant was bending over Mr. Dunn, who was lying on the floor, and that the defendant had a towel or napkin, trying to stop the flow of blood; that he told the officers that the man had come in and ordered some beer, and that he had sold him a bottle of beer, and that the man wanted another bottle, and that he told him that it was closing time and for him to get out, and that he further told the officers that Mr. Dunn stated: "I have heard about you * * * I will cut your ———— ———— head off"; and that the defendant further stated, "I took him at his word as I thought maybe he meant what he said," and that "When the man started to get up I shot him." The defendant's pistol was then found lying on the counter in the cafe, with only one bullet having been fired therefrom.

On the next day after the shooting the defendant employed two attorneys to defend him and paid them the sum of $200 on the agreed fee of $500. A plea of "not guilty" was entered at the February term when the defendant appeared "in his own proper person and by counsel"; and when the case was called for trial on August 2nd, it was set for trial on August 10, 1954. The attorneys advised the trial judge when the case was first called on August 2nd that the defendant had not paid all of their fee, but that they would notify him that his case had been set for trial on August 10, 1954. The defendant was then residing with a relative at St. Petersburg, Florida, some 800 miles away, but he came to the City of Meridian in Lauderdale County on August 9th, the day before the trial was held, and found that his attorneys were too busy to see him that day on account of being busy in court with other matters. On the next morning the defendant was asked by one of the attorneys whether he had the other $300 due on the fee, and answered that he didn't have it but that he had arranged for them to collect his government check payable monthly. He was then told to go on over to the courthouse. When his attorneys arrived there one of them asked to see the trial judge in his private office. He thereupon informed the trial judge that the defendant had not paid the remainder of their fee and that they could not continue to represent him. Upon the defendant being sent for, he requested the trial judge to allow him to telephone a Mr. Marvin Bates with a view of getting him to stand good for the fee. He was permitted to do so, but Mr. Bates declined to stand good for the fee, and thereupon the attorneys withdrew from the case. These facts as to what occurred in the judge's private office are disclosed in a special bill of exceptions signed by the trial judge.

This special bill of exceptions further disclosed that the trial judge repeated to the accused the conversation that he had had with one of the attorneys before the accused was summoned to the private office of the judge,

and whereupon the accused "responded that he didn't have the money and was unable to raise the money for the fee"; that thereupon the judge advised the defendant that the case was set for trial and he would have to proceed with it, and asked the accused if he wanted to call any other lawyer; that the accused then stated "he had no money with which to pay a lawyer, but asked the judge if it was possible to appoint a public defender," such as are furnished in some other states; and that the judge then advised the accused that "We do not have a public defender and he did not have authority to appoint a lawyer and pay him * * * , as it did not constitute a capital case."

The special bill of exceptions further discloses that: "At this juncture Mr. Gray (the defendant) agreed that he would just have to proceed and both Mr. Gray and the judge returned to the courtroom, and * * * the court empanelled the jury and commenced the trial."

Under all the facts and circumstances disclosed by the record, we interpret the last quoted statement in the special bill of exceptions wherein it states that the defendant "agreed that he would just have to proceed" to mean that he recognized that he had no other alternative.

We can readily appreciate the attitude of the trial judge in his desire to proceed with the trial, since the State had procured the attendance of the chief prosecuting witness from Roxbury, Massachusetts, and presumably at the expense of the county. Moreover, the defendant did not request a continuance of the case for the term, and he would not have known how to prepare an application for such a continuance, and he did not request additional time within which to make some further effort to obtain counsel during the term of court then in session, as he seemed to have recognized that the trial had to proceed immediately.

One of the assignments of error on this appeal, and the only one that we need to consider, is that the de-

fendant was then placed on trial "within fifteen or twenty minutes after his attorneys withdrew, and without benefit of counsel  *   *   *  ."

We are of the opinion that the trial should have been postponed until a later hour on that day or until the next day in order that it could be ascertained whether or not the defendant could arrange for some other attorney to defend him. It is not unreasonable to assume that if he had been granted some further time he would have been able to procure the services of some other attorney, since he did in fact later procure the services of another local attorney, a former assistant attorney general of this State, who filed on his behalf a motion for a new trial at the same term of the court after the trial had been concluded, and who is now representing the defendant on this appeal.

This attorney introduced the defendant in support of the motion for a new trial, and fully developed by his testimony all of the facts and circumstances hereinbefore stated, as to the then inability of the accused for lack of time to employ other counsel before he was put to trial, within fifteen or twenty minutes after his former attorneys had withdrawn from the case. This attorney further developed from the testimony of the accused on the motion for a new trial his alleged contention that the shooting occurred under circumstances which tended to support his claim of self-defense, including his testimony to the effect that he did not order Mr. Dunn to leave the cafe without some reason for so doing. He testified on this motion, in substance, that he was required by a city ordinance to stop selling beer and have all beer bottles removed from the counter by midnight; that when he sold Mr. Dunn his bottle of beer he asked him if he could drink it within the time then remaining before midnight, when Mr. Dunn replied, "Yes, I can"; that the defendant then "went to the register, rung it up, checked the register for the night and looked up at the clock and noticed it was approximately two minutes to twelve or one min-

ute to twelve''; that the accused then noticed that Mr. Dunn did not have all the beer in his glass, and that the accused picked up the beer bottle, poured the remainder of the beer in the half-filled glass, and then set the bottle under the counter; that Mr. Dunn then said, ''He wanted some beer to go'' (evidently meaning that he wanted some to take to his hotel room with him); that the accused told him that ''I am sorry I can't serve you,'' since it was then twelve o'clock; that the accused continued on back to the bathroom, and that as he came back Mr. Dunn made the remark, ''Oh, I have heard about you''; that it was then about a minute or two after twelve; that as the accused started to turn off the neon lights, this customer then raised up ''sort of like reaching for the hair of my head,'' and said ''I will cut your ―― ―――――― head off,'' and that it was then that he pulled the gun and shot him one time. He was larger and in better physical condition than the defendant. No other witness was introduced on the motion for a new trial.

At the conclusion of the testimony of each of the witnesses for the State, the trial court was at pains to try to fully explain to the defendant that he had the right to cross-examine the witness; but it appears that the defendant either didn't know what ''cross-examine'' meant, or didn't know how to question the witness so as to develop any part of his alleged defense. In other words, the record discloses that he made only a token effort to develop the facts that may have tended to support his alleged theory of self-defense; and his plight was pathetic in defending the case.

· At the close of all of the testimony for the State, the court explained to the defendant that he had the right to be sworn as a witness, and make any statement, under oath, to the jury that he might desire to make. The defendant's response was, in substance, that he didn't care to take the stand, but he wanted to make a statement to the jury as to the circumstances under which

he did the shooting. He seems to have been much confused as to whether or not a statement made by him to the jury in his own behalf could be considered as evidence, without taking the stand as a witness.

The judgment recites that the jury "after having heard all of the testimony, argument of counsel, and received the instructions of the court," etc., returned into open court the verdict of guilty as charged. The record does not disclose what statements or argument, if any, was made by the defendant to the jury, but throughout the trial the court undertook to make clear to the defendant, in substance, that if he wanted the jury to consider as evidence any statement that he might make, it would be necessary for him to take the stand as a witness in his own behalf. But the record further discloses that the defendant seemed to be wholly unable to distinguish the difference in the effect of what he might say to the jury after the evidence was concluded, and the effect of anything he might say under oath as a witness. In other words, the record clearly discloses that the defendant stood in dire need of counsel.

It is true that the defendant was somewhat derelict in that he had not performed his agreement with his former counsel, but since he had paid $200 initially on the fee and then testified on the motion for a new trial that when he was asked by one of his former counsel, before they went to the courthouse, whether he had the other $300 on the fee, he told him, " 'No, sir; I haven't got it, but I have arranged so you can draw my (government) check in the amount of $63 a month until the fee is paid,' " it would seem that he probably entertained the honest belief, after being notified by letter addressed to him at St. Petersburg, Florida, a few days prior to the date set for the trial, that the remainder of the fee would have to be paid, that he would be able to induce his attorneys to accept this arrangement, and for that reason did not come to Meridian earlier and try to employ other counsel. Then, too, it appears that his wife

took charge of his place of business, sold everything, and left.

██ Under all of the foregoing facts and circumstances, the court is of the opinion that the defendant by being put to trial within a few minutes after his counsel had withdrawn from the case, was unable to make an adequate and proper defense, and that he was therefore deprived of his liberty without due process of law, within the meaning of Section 14 of our State Constitution of 1890; and that therefore the case should be reversed and remanded for a new trial.

Reversed and remanded.

*Hall, Lee, Holmes* and *Ethridge, JJ.,* concur.